1

2

3

4

5

6

7

8       IN THE UNITED STATES DISTRICT COURT

9       FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JASMEEL MANOJ KUMAR

11            Petitioner,                        No. CIV S-09-2455 JAM CHS P

12       vs.

13   JAMES YATES,

14            Respondent.         FINDINGS AND RECOMMENDATIONS

15   _____/

16                          I.  INTRODUCTION

17            Petitioner Kumar, a state prisoner, proceeds pro se with a petition for writ of

18   habeas corpus brought pursuant to 28 U.S.C. § 2254.  Petitioner stands convicted of various sex

19   offenses involving four victims in the Sacramento County Superior Court, case number

20   01F01700, for which he is currently serving an indeterminate term of 100 years to life in prison,

21   plus an additional determinate term of 145 years.  Based on a thorough review of the record and

22   applicable law, it is recommended that the petition be denied.

23                          II.  BACKGROUND

24            The following recitation of facts is taken from the unpublished opinion of the

25   California Court of Appeal, Third District, on direct review of petitioner's convictions.  Since

26   these facts have not been rebutted with clear and convincing evidence, they are presumed correct.

1

1  28 U.S.C. § 2254(e)(1); *Taylor v. Maddox*, 336 F.3d 992, 1000 (9th Cir. 2004).

2
3
4  From August 2000 to February 2001, a group of young men picked up prostitutes on Stockton Boulevard in Sacramento, kidnapped and sexually assaulted them. Their crime spree ended after they picked up a teenager who was not a prostitute. She escaped after the sexual assault and called the police. One of her attackers was arrested at the scene and the others shortly thereafter.

5
6
7
8
9  In a 68-count information, the People charged six defendants with various crimes arising from serial gang rapes against eight victims. The court severed the trial of one defendant, and the case proceeded to trial against the remaining five defendants [including petitioner Kumar] with two juries. Seven counts involving one victim were dismissed after she failed to appear at trial. The two juries convicted defendants of most, but not all, of the charged offenses. Each defendant was sentenced to a lengthy prison term, including a life sentence.

10
11  ...

12
13
14
15
16
17  As with most sexual assault cases, this case turned on the credibility of the victims, both as to what crimes occurred and who the perpetrators were. All of the victims' credibility was bolstered by the number of victims; seven women told very similar stories. Corroboration was also provided by DNA and other forensic evidence. In the case of Naryan, who had a separate jury, the prosecution also presented his three statements to the police in which he admitted some of the conduct at issue. The strength of the evidence varied as to each victim. The prosecution did not present the case in chronological order; rather, the strongest case, in which the victim was not a prostitute and reported the assault immediately, was presented first.

18  *People v. Deo, et al.*, 2008 WL 2404210 at 1 (Cal. Ct. of App. 3rd Dist. June 13, 2008).

19  Petitioner was charged and convicted in connection with four of the eight victims:

20  Lori, C.W., and Rebecca, and A.T.  Evidence was presented at trial with respect to the offenses

21  against those victims as follows:

22  ***Lori S.***
    ***Counts 34 to 47***

23
24
25
26  On the night of February 21, 2001, 17-year-old Lori S. went to a pool hall in Modesto with her sister and her cousin. They met her sister's friends there and went to the home of one of the friends and drank wine coolers. Around midnight, Lori had a fight with her sister and left the house. She found herself alone in an unfamiliar neighborhood, in a bad area of Modesto. She was chased by a

German Shepherd dog, that took one of her sandals. Lori ran to a schoolyard; the dog was barking and she was crying.

A gold Honda drove by and stopped. Inside were five men: Amit Narayan, who lived in Modesto, and four of the defendants. Deo was the driver, Narayan was in the front passenger seat, Kumar was behind the driver, and Nalesh Prasad was in the middle. Prasad was Amit Narayan's brother-in-law and Narayan and Amit Narayan were related. Deo had borrowed the car earlier that day from Narayan's employer at an Arby's Restaurant.

When the car stopped, Kumar got out and retrieved Lori's sandal for her. He seemed nice and offered her a ride, so she got in the car. The men spoke to each other in a language other than English and Lori thought they were Indian. They dropped off Amit Narayan.

The car went to a Chevron gas station where they bought gas. Kumar got out and bought some water or gum. The car then made a wrong turn to take Lori home. When she pointed this out, she was told one of the men was late for work, so they had to take him to work first. They got on Highway 99 and drove north. While on the highway the men smoked out of a glass pipe. They got off the highway somewhere past Harney Lane and drove around for five minutes.

The car stopped by the side of the road. Kumar grabbed Lori's breasts and she nudged him off. Deo said, "Shut the fuck up, bitch. Do what we say. We have a gun." Kumar stretched out her shirt and ripped her bra so she took them off. Prasad grabbed her arms and Kumar pulled off her pants and underwear. Lori would not open her legs so Kumar grabbed her neck until she opened them.

Kumar put his mouth on Lori's vagina and then put his fingers inside her. Lori begged him to stop, telling him she was only 15 and a virgin. Kumar raped her and grabbed her breasts. Lori testified, "It hurt so bad."

Deo got in the car and told Lori he would take her home after he was done. He raped her and grabbed her breasts.

Nalesh Prasad was next; he stuck his penis in her. When he was finished raping her, he got out of the car.

Narayan got in, pulled down his pants, and played with his penis. He took Lori's head and forced her mouth on his penis, saying: "suck my dick." Lori started to gag and lifted up. Narayan put her legs over his shoulders and raped her. He grabbed her breasts.

Narayan took Lori out of the car and ordered her to suck Prasad's penis. He forced her mouth on Prasad's penis and she gagged.

Narayan tried to put his penis in her anus. Then he put it in her vagina and raped her.

When another car came by the men forced Lori back into the car and told her to put her clothes on. Someone gave her a sweater. They drove off, getting lost before they found the highway. They told Lori to put her head down. While her head was on Narayan's lap, he grabbed her hand and put it on his penis for a second.

When the car stopped, Kumar, Deo and Prasad got out. Narayan still held Lori's head down. Kumar got in the car and drove around the corner. Lori got in the front seat and Narayan drove to a Shell gas station. The car stopped next to a black truck. Narayan and Lori got out of the car and Kumar got out of the truck. Kumar handed Narayan a tin box and said, "here's the stuff." Inside the tin box were baggies containing a white substance. Kumar said he had to drop the car off and would return. He drove the gold car away. Kumar returned the car to Narayan's boss.

After the others left, Lori was crying in the truck. Narayan said he felt bad; he was sorry and would like to take her to breakfast. Lori said she needed to go to the bathroom. She got out of the truck and walked slowly to the gas station. When she saw a woman she began crying. She went to the clerk, whispered she had just been raped, and asked him to call 911. The woman took the license plate number of the truck. A tape of the 911 call was played to the jury.

The police responded and arrested Narayan. Kumar was arrested that evening. Deo was arrested March 1.

Narayan was interviewed that day. His videotaped statement was played only to Narayan's jury. In it, Narayan recounted picking up a crying Lori. He described the assault: "Jaz fucked, Ravin fucked, my cousin fucked ... and then I did." According to Narayan, Jaz took her clothes off; he told her he had a gun.

A sexual assault examination revealed Lori's labia was reddened from the 10-to 3-o'clock positions. There was a tear at the 6 o'clock position. Her cervix was reddened and her vaginal walls were tender and painful. The injuries were acute. The findings were consistent with her history of a forced sexual assault. Bruises on Lori's legs were consistent with her assailant prying her legs apart. A hair was found in her cervix.

A fiber analysis found fibers similar to those of the Honda's seat on Lori's clothing. Fibers similar to her red fleece top were found on Kumar and Narayan's clothing. A fiber similar to Narayan's shirt was found on Lori's clothing.

DNA analysis of a swab from Lori's neck matched Deo's profile. The probability of finding another individual with the same DNA

profile was 1 in 10,000 East Indians, 1 in 460,000 African Americans, and 1 in 35,000 Hispanics.[FN3] DNA analysis of the hair matched Narayan's profile, with a probability of 1 in 30 trillion.[FN4] The confidence rate for all statistical analysis of DNA matches was 10-fold, meaning the actual probability was within the range of 10 times less or 10 times greater.

> FN3. The probability statistics for mixed samples containing DNA of both the victim and the assailant were recalculated, deleting from the product rule alleles that were shared by the victim and the assailant, resulting in significantly lower numbers than first reported.

> FN4. In determining which databases to use for statistical purposes, the district attorney offered to use only the lowest frequency without mention of the ethnicity of the database. Only Narayan accepted this proposal. For the other defendants, three databases were used: East Indian, African American, and Hispanic. The defense was invited to present the Caucasian database or any other database they choose.

Deo, Kumar and Narayan were convicted of four counts of sexual battery. (Pen.Code, § 243.4, subd. (a).) Narayan was convicted of another count of sexual battery, of which Deo and Kumar were acquitted. Deo, Kumar and Narayan were convicted of five counts of rape in concert (Pen.Code, § 264.1), three counts of oral copulation in concert (Pen.Code, § 288a, subd. (d)), and one count of penetration with a foreign object in concert (Pen.Code, §§ 264.1/289). As to all of these counts, enhancements for kidnapping (Pen.Code, § 667.61, subds.(d)(2) & (e)(1)) and multiple victims (Pen.Code, § 667.61, subd. (e)(5)) were found true.

### C.W.
### Counts 19 to 26

About two weeks earlier, 21-year-old C.W. was walking home through the K-Mart parking lot at Stockton Boulevard and Fruitridge Road around midnight. C.W. was a prostitute with a crack cocaine habit, but she denied she was working at the time. A tan car with three men in it drove up and the backseat passenger asked if she knew where they could get some marijuana. Hoping to get a ride home, C.W. got in the car. The three men were Indian; Narayan was in the backseat, Kumar the front passenger and Deo was driving.

When they passed her street without turning, C.W. asked what was going on. Narayan reached over and touched her breast. She told him he could not do that unless he paid and he just laughed. C.W. continued to argue and Narayan said they were going to his house to get some money.

5

Narayan pulled out a gun and told C.W. she was going to do what they told her. She began crying and told them they could just pay her. When the car stopped in a park, Deo told C.W. to take her clothes off. He opened her door, telling her to get out because they were going to walk. She refused. Deo got back in the car and again ordered her to take off her clothes. She complied.

Deo pulled out some condoms and passed them around. Narayan passed the gun to the front seat. He took out his penis and told C.W. to orally copulate him. Then he raped her. During the rape he told her to be quiet; if she let him take the condom off he would not let them kill her. Narayan took the condom off. When he tried to put his penis in her anus, she screamed. He raped her again. Narayan ejaculated and got out of the car.

Kumar passed the gun to Deo and got in the back seat. He pulled down his pants, put on a condom, and told C.W. to orally copulate him. Afterwards he made her get on top on him. He tried to sodomize her and then raped her, ejaculating. He opened the car door and threw the condom on the ground.

Deo then got in back and quickly raped C.W.. He wore a condom.

After the assault C.W. asked for her clothes; she wanted her crack cocaine and her pipe. Once she mentioned the drugs, the men wanted them. They searched her clothes and the floor of the car looking for them. After C.W. was dressed, Deo ordered her out of the car. When she got out, she screamed and Deo hit her. The car took off. As it left, C.W. turned and got a partial license plate number.

She ran to a nearby house and asked the woman inside to call the police because she had been raped. When the police arrived, they took her to the UC Davis Medical Center. She told the police the assailants took a necklace, her money and a pipe. She gave the license plate number as 4ETX-7.

C.W.'s sexual assault examination showed several little fissures or tears at the vaginal opening. The injuries were acute, occurring in the previous 24 hours. The nurse practitioner concluded the exam was consistent with C.W.'s description of the assault. C.W. described her assailants as American Indians.

C.W. identified Narayan and Kumar at trial. She testified the driver, Deo, wore a baseball cap. She saw his face when he was on top of her, but conceded she did not get a good look. When she was first shown a photographic lineup that included a three-year-old DMV photo of Deo, she did not recognize him. Detective McBeth-Childs showed her a second lineup, using a recent booking photo of Deo, and C.W. then identified him. She said Deo was the driver. She was certain; "I'll never forget that face." The detective testified

Deo looked different at trial; his hairstyle was different and his face was fuller.

Deo owned a Toyota Corolla with the license plate number 4ETX165. Fibers on C.W.'s pants and shirt were similar to fibers from the seat of the Toyota Corolla. Narayan and Deo's fingerprints were found in the car. Two condoms were collected from the scene.

DNA analysis was performed on a vaginal swab, two condoms, and C.W.'s pants. DNA on the vaginal swab matched Narayan, as did that on the interior of one condom, with a probability of 1 in 30 trillion. The second condom had DNA that matched Kumar's profile. The probability of another individual with the same profile was 1 in 20,000 in the East Indian database, 1 in 3 million in the African American database, and 1 in 320,000 in the Hispanic database.

In his taped statement, Narayan said one time they picked up a girl and took her to a park. Deo, Kumar and he had sex with her and then drove her back.

Deo, Kumar and Narayan were convicted of robbery (Pen.Code, § 211); a personal use of a firearm allegation (Pen.Code, § 12022.5, subd. (a)(1)) was found true as to Deo and Kumar, but not as to Narayan. The three men were convicted of two counts of attempted sodomy in concert (Pen.Code, §§ 664/286, subd. (d)) with an enhancement for use of a firearm or deadly weapon. (Pen.Code, § 12022.3, subd. (a).) They were also convicted of three counts of rape in concert and two counts of oral copulation in concert, all with personal use, kidnapping and multiple victim enhancements.

*People v. Deo*, *supra*, at 1 -5.

### Rebecca J.
### Counts 58 to 68

On the night of February 5, 2001, 20-year-old Rebecca J. was walking down Stockton Boulevard from Motel 6.[FN6] She saw a man at a pay phone who looked suspicious. Just then a car pulled up. As the car pulled into the lot, she began to walk in the other direction. She was grabbed from behind by a bald man. He put a gun to her head and told her to get in the car. Someone put a jacket over her head.

> FN6. Rebecca testified she was jogging or power walking. She denied she was soliciting prostitution, although she had several arrests for prostitution.

The men were all East Indian. They told her to shut up and keep her head down. She was scared to death.

After a 45-minute ride, the car stopped at a construction site where there were three trailers and a billboard. The bald man told her to stay in the car. The other two men got out and broke into one of the trailers by breaking the window. Meanwhile, the bald man held a gun to Rebecca's head and raped her.

The bald man then took her to the bed in the trailer and raped her again. He put his finger in her vagina several times. He tried to put his penis in her anus, but she screamed and he stopped. He still had the gun.

While Rebecca was being raped, the other two men smoked drugs. When the bald man finished, the driver came over and raped her while the bald man used drugs. Then the passenger, the man at the pay phone, took his turn and raped her.

One by one, in the same order of bald guy, driver and man at pay phone, the three men forced her to orally copulate them by putting a gun to her head. After each ejaculated, she spit it on the floor.

After the assault, the men took things from the trailer in a milk crate. The bald man walked her back to the car. She got in back and they put her head down and a jacket over her head. After a 45-minute drive, the bald man let her out. He told her not to turn around until they left.

Rebecca ran three or four blocks to a police station. She encountered a police officer and told him she had been raped by three male East Indians. She described the weapon as a black semi-automatic handgun, possibly a .380. She was taken to UC Davis Medical Center.

There a physician's assistant collected her clothing and took vaginal and rectal swabs. During the visual exam he found a black hair in Rebecca's upper labial area; the area was tender. There was a five millimeter tear on the posterior fourchette and a tear extending to the fossa navicularis. These injuries were consistent with forcible intercourse.

Rebecca identified her three assailants in photographic lineups. She picked Narayan as the man who raped her the first two times. She identified Kumar as the man at the pay phone. In selecting Deo's picture, she said he whispered "they made me do this" all the way back. At trial she recognized Narayan; "I would bet my life on it."

The trailer where the assault occurred was owned by a man who worked for CC Meyers on a construction project near Rocklin. The trailer had been broken into and several items taken. The owner found a condom wrapper in the trailer. Kumar had worked at the construction site.

In the third interview he gave to the police, which was played only to Narayan's jury, Narayan described an incident in which he, Deo and Kumar picked up a girl and took her to a trailer near Rocklin, where Kumar worked. Narayan stated all three had both intercourse and oral copulation with her. The others also tried sodomy. Afterwards they stole items from the trailer. Narayan told the detective he did not remember if he ejaculated. When the detective asked how he could not remember that, Narayan responded, "Because, you know, we did so many girls like that."

DNA that matched Narayan's profile was found on a vaginal swab and a rectal swab taken from Rebecca. The probability that another individual matched that profile was 1 in 1 million.

Deo, Kumar and Narayan were convicted of three counts of rape in concert, two counts of penetration with a foreign object in concert, one count of sodomy in concert, and three counts of oral copulation in concert, all with personal use of a firearm, kidnapping and multiple victim enhancements.

### A.T.
### Counts 48 to 57

In early October 2000, A.T. was working as a prostitute on Stockton Boulevard. A goldish-tan car approached and the driver said he wanted a date; he had $80. Excited about the money, A.T. got in the car and said she had a motel room. The driver said he did not go to motels; he had a spot down the street. He drove to a court where an employment training center was and told A.T. to get in the back seat.

When she opened the door, she heard a shuffle in the bushes and two men came out. The driver grabbed her by the throat and told her not to scream or he would kill her. He lifted his shirt and revealed a gun. He put her in the back seat; the other two men got in on either side of her. The driver got in and drove. The two men in back fondled and groped her. One was bald and chunky and the other skinny. The driver told her to shut up and stop crying. He said he hated prostitutes, "ho's and bitches" because they made him do drugs.

The men spoke to each other in a foreign language. A.T. thought they were Indian. Earlier the driver said he was Hawaiian.

They drove about 20 minutes to a new home construction site. A.T. remembered the flags. The driver told her not to scream because his dad lived there. If she screamed, he would kill her.

The men led her to an unfinished house. The driver told her to take her clothes off. He raped her, biting her nipples.

/////

1    When he was finished he called the "bald, fat guy" over. That man
     told her not to cry, he would not hurt her. He tried to rape her, but
2    did not have an erection so he forced her to orally copulate him. He
     tried several times either to rape or to sodomize A.T., forcing her
3    to orally copulate him between each attempt. Finally, he was able
     to sodomize her until ejaculation and then rape her until
4    ejaculation.

5    Then it was the skinny man's turn. He raped A.T. for just a few
     minutes until the others yelled. He told her to put her clothes on.
6
     When the men left, the fat one socked A.T.. The car took off,
7    leaving her behind. A.T. flagged down a truck and used the truck
     driver's cell phone to call her boyfriend. She started walking home,
8    got lost and stopped at a house and called again.

9    A.T. did not report the assault. She was concerned she would be
     arrested because she had an outstanding warrant for prostitution.
10   She also believed in "street justice;" what happened on the streets
     would be taken care of on the streets. She eventually reported the
11   crime to Detective Bray, who put her in touch with Detective
     McBeth-Childs. A.T. took the detective to the scene of the rapes.
12
     At trial, A.T. identified Narayan and Nalesh Prasad as two of her
13   attackers. She identified Narayan as the driver. In a photographic
     lineup she had identified Kumar as the skinny or malnourished
14   one, Narayan as the fat one, and Deo as the driver. A.T. was not
     able to identify Deo from his 1998 DMV picture, but could identify
15   him from his booking photo. She said he had the same look on his
     face in that picture as when he told her he hated "bitches" like her.
16   A.T. had earlier selected fillers as looking like the driver. She had
     identified Prasad as either an assailant or a customer.
17
     In an interview with the police, Narayan described an incident in
18   which they took a girl to a house under construction near Laguna.

19   Deo, Kumar and Narayan were convicted of sexual battery, four
     counts of rape in concert, three counts of oral copulation in
20   concert, one count of sodomy in concert and one count of
     attempted sodomy in concert. Personal use of a firearm allegations
21   were found true as to Deo and Narayan, and kidnapping and
     multiple victim enhancements were found true for each forcible
22   sex offense as to all three defendants.

23   *People v. Deo*, *supra*, at 8-11.

24        Of 50 counts against petitioner that were sent to the jury, he was found guilty of

25   42.  The trial court sentenced him to 145 years in prison, plus an indeterminate term of 100 years

26   to life.

On direct review, the California Court of Appeal, Third District, affirmed petitioner's convictions and the judgment in an unpublished opinion.  The California Supreme Court denied review.  Petitioner sought habeas corpus relief in the California Supreme Court which was likewise denied.  The parties agree that the claims presented have been properly exhausted in state court although respondent contends that petitioner's ground five is procedurally defaulted.

### III.  GROUNDS FOR RELIEF

The pending federal petition presents 11 grounds for relief.  The first four grounds each challenge the admission of DNA evidence at trial; these grounds will be addressed together in one subsection herein.  Grounds four through eleven will be separately set forth and discussed, except for ground seven, which duplicates the allegations made in ground six.  None of the grounds are accompanied by factual bases or citation to legal authority within the petition.  For purposes of this opinion, the pro se petition will be liberally construed to incorporate the arguments made in the corresponding state court pleadings.  Petitioner claims:

Ground One: The trial court denied my Fourteenth Amendment right to due process when it overruled my *Kelly* prong one challenge, and found in error that the relevant scientific community agrees that a range of varying "peak heights" of relevant fluorescent unites may be used by lab technicians in "calling" a peak on an electropherogram a true allele, or in excluding it from consideration of a DNA profile; for what the scientists do not agree on is what range is the proper range for doing so, thus the threshold at which the Sacramento County crime lab in this case "called" peak heights as alleles was improper.

Ground Two: The trial court denied my Fourteenth Amendment right to due process when it rejected my *Kelly* prong one challenges, and found in error that the scientific community generally permits a known victim's genotype to be "subtracted out" of multiple-source mixtures, before calculating the random match probabilities for the alleles that remain behind.

Ground Three: The trial court denied my Fourteenth Amendment right to due process when it overruled another of my *Kelly* prong one challenges, and found in error that the scientific community generally accepts the "product rule," or random match probability as the proper statistical methodology to employ for calculating the likelihood of match probabilities in multiple mixed source cases.

Ground Four: I was denied my Fourteenth Amendment right to due process when, in contravention of the California Supreme Court's decisional law, the trial court

ruled in error that, in accordance with *Kelly's* prong one, the relevant scientific community generally accepts the use of African-American, Hispanic, and East Indian (but not Caucasian) databases for determining the significance of the DNA matches in this case.

Ground Five: My Fourth Amendment right to be free of unreasonable searches and seizures, and my Fourteenth Amendment right to due process was violated when a sample of my blood was involuntarily taken from me for inclusion in the California Department of Justice's convicted offender data bank.

Ground Six: The trial court denied my fundamental rights to due process and a fair trial under the Sixth and Fourteenth Amendments when it admitted numerous cumulative and overly prejudicial photographs of me and my co-defendants handling guns in a seeming unsafe manner.

Ground Seven: The trial court erred prejudicially in admitting evidence of photographs of co-defendants pointing guns at themselves and at each other denying me due process of the law.

Ground Eight: The instructions given in this case improperly directed the jury to make an "in concert" finding if it found that I was an aider and abettor of the offenses committed by others in this case.

Ground Nine: Under the facts of this case, imposition of a term of 25 years to life under Penal Code section 667.61(d)(2), rather than 15 years to life under 667.61(e)(1), deprived me of due process of law and equal protection of the law.

Ground Ten: Conspiracy does not exist as an independent theory of criminal liability in California, and the trial court erred by instructing that conviction could be reached under that theory.

Ground Eleven: All counts based on alternative theories of perpetrator or aiding and abetting or co-conspirator liability must be reversed because there was no unanimity on the intent element as to those counts.

## IV. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999). Under

AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

*Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

This court looks to the last reasoned state court decision in determining whether the law applied

to a particular claim by the state courts was contrary to the law set forth in the cases of the United

States Supreme Court or whether an unreasonable application of such law has occurred. *Avila v.*

*Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919 (2003).  It is the habeas

corpus petitioner's burden to show the state court's decision was either contrary to or an

unreasonable application of federal law.  *Woodford v. Visciotti*, 537 U.S. 19, 123 S. Ct. 357, 360

(2002).

## V.  DISCUSSION

A.      Grounds One through Four (DNA Evidence)

On direct review of petitioner's convictions, the California Court of Appeal

explained:

> The DNA typing in this case was performed by the PCR-STR method. This methodology has been found to be generally accepted in the scientific community. In addition, capillary electrophoresis, the procedure used to analyze the amplified DNA fragments, has been found to have gained general acceptance in the scientific community.

> "PCR forensic analysis involves three steps. First, DNA is extracted from cells in the sample. Second, select regions of the DNA are amplified. Scientists have identified these regions, also referred to as genes or genetic markers, as areas that exhibit great genetic variation among the population.... Polymarker analysis, which amplifies several loci simultaneously, has also been

validated for use in PCR testing. After amplification, in the third and final step of PCR analysis the amplified gene is 'typed,' through the use of DNA probes, to identify the specific alleles it contains.

The Sacramento laboratory uses an ABI 310 Genetic Analyzer to analyze amplified DNA.... Because PCR-STR methodology has been generally accepted, it is unnecessary to establish the general scientific acceptance of each PCR-STR test kit.

Typing of DNA is accomplished by capillary electrophoresis. The process was described in *People v. Henderson, supra,* 107 Cal.App.4th 769, 778-779: In capillary electrophoresis "the DNA sample is mixed with different colored dyes and injected into a thin capillary in a machine designed to perform the process. When the DNA fragments reach the end of the capillary, a laser is used to trigger a response in the form of light based on the dyes applied to the DNA sample, which is converted automatically by the computer software into different size peaks that appear on a graph." Two software programs are used to analyze the data. The first, the GeneScan program, determines the base pair size of the peaks. Then the Genotyper program converts the peaks into actual genotype calls by comparing the peaks to an allelic ladder. The peaks on the graph are measured in relative fluorescent units (RFU)...

Once a match at multiple loci has been declared, the next step is to determine its statistical significance. Forensic laboratories use one or more population databases containing measurements of the DNA fragments of several hundred people at each loci tested. One technique to put a number on it is the product rule. "The essence of the product rule is the multiplication of individual band probabilities to arrive at an overall probability statistic expressed as a simple fraction, such as 1 in 100,000. The rule is applied in two stages: first, for determining the allelic frequency at each locus, and then, for determining the alleles' combined frequency at all loci. Under the product rule, the frequencies found at each loci are multiplied together to generate a probability statistic reflecting the overall frequency of the complete multi-locus profile. The resulting statistic will oftentimes be very small. The unmodified product rule is generally accepted in the scientific community.

*People v. Deo*, *supra* at 13 -14 (citations omitted).

In determining the admissibility of evidence derived from a new scientific technique, California courts apply the three-pronged approach approved in *People v. Kelly*, 17 Cal.3d 24 (1976). Under this approach, courts consider (1) whether the method is reliable- i.e., whether it has gained general acceptance in the relevant scientific community; (2) whether the

14

1  witness is an expert qualified to give an opinion on the subject; and (3) whether the correct

2  scientific procedures were followed in the particular case. *People v. Deo*, *supra*, at 14 (citing

3  *People v. Henderson*, 107 Cal.App.4th 769, 776 (4th Dist. 2003) and *People v. Leahy*, 8 Cal.4th

4  587, 604 (1999) (retaining *Kelly* formulation after *Daubert v. Merrell Dow Pharmaceuticals,*

5  *Inc.*, 509 U.S. 579 (1993)). "[O]nce a trial court has admitted evidence based on a new scientific

6  technique, and that decision is affirmed on appeal by a published appellate decision, the

7  precedent so established may control subsequent trials, at least until new evidence is presented

8  reflecting a change in the attitude of the scientific community." *People v. Deo*, *supra*, at 14

9  (citing *People v. Kelly*, 17 Cal.3d at 32).

10          Prior to trial, defendants challenged the introduction of the prosecution's DNA

11  evidence.  Defendants challenged the evidence on the same grounds petitioner asserts in the

12  pending federal petition, alleging (1) there was no generally accepted RFU threshold for

13  measuring alleles; (2) there were no generally accepted rules for interpreting mixed DNA

14  samples; (3) the proper scientific procedures for analysis were not followed; and (4) there was no

15  generally accepted database for defendants for a proper statistical analysis.  The trial court held a

16  lengthy *Kelly* hearing over several days.  Ultimately, the trial court determined the prosecution's

17  DNA evidence was relevant and admissible and DNA evidence admitted at trial tied petitioner to

18  the assault on C.W.

19          In a lengthy discussion on direct review, the California Court of Appeal rejected

20  each of the petitioner's grounds for relief premised on the introduction of DNA evidence.  *People*

21  *v. Deo*, *supra*, at 14-22.

22          Unless a state court evidentiary ruling violates due process or other constitutional

23  guarantees, questions related to the admissibility of evidence remain matters of state law for

24  which federal habeas corpus relief is unavailable.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68

25  (1991).

26  /////

1   In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the United States Supreme

2   Court held that scientific evidence need not have gained general acceptance in the relevant

3   scientific community in order to be admissible under the Federal Rules of Evidence. *Daubert*,

4   509 U.S. at 597. Because it involved an interpretation of the Federal Rules of Evidence,

5   "*Daubert* does not set any specific constitutional floor on the admissibility of scientific

6   evidence." *Wilson v. Sirmons*, 536 F.3d 1064, 1101-02 (10th Cir. 2008); *see also Kinder v.*

7   *Bowersox*, 272 F.3d 532, 545 n.9 (8th Cir. 2001) ("*Daubert* does not bind the states, which are

8   free to formulate their own rules of evidence subject only to the limits imposed by the

9   Constitution.").[1]

10   In *Holley v. Yarborough*, the Ninth Circuit explained:

> Under AEDPA, even clearly erroneous admissions of evidence that
> render a trial fundamentally unfair may not permit the grant of
> federal habeas corpus relief if not forbidden by "clearly established
> Federal law," as laid out by the Supreme Court. 28 U.S.C. §
> 2254(d). In cases where the Supreme Court has not adequately
> addressed a claim, this court cannot use its own precedent to find a
> state court ruling unreasonable. *Musladin,* 549 U.S. at 77, 127
> S.Ct. 649.

16   *Holley*, 568 F.3d 1091, 1101 (9th Cir. 2009).

17   "Although the Court has been clear that a writ should be issued when

18   constitutional errors have rendered the trial fundamentally unfair" (*Id.* (citing *Williams,* 529 U.S.

19   at 375)), the Supreme Court "has made very few rulings regarding the admission of evidence as a

20   violation of due process." *Holley*, 568 F.3d at 1101. If there is no applicable "clearly established

21   Federal law," it cannot be concluded that a state court's ruling was an "unreasonable

---

[1] State courts and legislatures remain free to adopt more rigorous safeguards regarding the admissibility of scientific evidence than those imposed by the Federal Constitution. *California v. Trombetta*, 467 U.S. 479, 491 n.12 (1984). The California Supreme Court has held that California courts are not bound by *Daubert* and thus continue to require general acceptance in the scientific community as a condition of admissibility of scientific evidence. *See People v. Leahy*, 8 Cal.4th 587, 594-603 (1994). Of course, no relief is available for an alleged failure by the state court to comply with state law. *See Estelle*, 502 U.S. at 67-68.

1    application."  *Id.*  In this case, it appears that all of petitioner's DNA claims fail for lack of

2    clearly established precedent, as the Supreme Court has not established specific constitutional

3    requirements for the admissibility of DNA evidence or scientific evidence in general.

4              Nevertheless, petitioner's claims would fail under even Ninth Circuit precedent.

5    The Ninth Circuit has held that the improper admission of evidence violates a defendant's due

6    process rights only when it renders the trial fundamentally unfair.  *Johnson v. Sublett*, 63 F.3d

7    926, 930 (9th Cir. 1995) ("The admission of evidence does not provide a basis for habeas relief

8    unless it rendered the trial fundamentally unfair in violation of due process.") (citing *Estelle*, 502

9    U.S. at 67-68).  An evidentiary ruling renders a trial so "fundamentally unfair" as to violate due

10   process only if "there are *no* permissible inferences the jury may draw from the evidence."

11   *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998) (emphasis in original) (quoting *Jammal*

12   *v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991)); *see also Boyde v. Brown,* 404 F.3d 1159,

13   1172 (9th Cir. 2005) ("A habeas petitioner bears a heavy burden in showing a due process

14   violation based on an evidentiary decision.").

15             Petitioner fails to show there were no permissible inferences to be drawn from the

16   DNA evidence.  Evidence that the DNA profile generated from the condom found on the ground

17   where C.W. was assaulted matched petitioner's DNA was highly probative to show that he had

18   sex with that victim.  At trial, petitioner was free to challenge the DNA evidence including the

19   testing methodology used and the conclusions drawn therefrom.  Nothing prevented him from

20   introducing expert testimony in an attempt to show, for example, that use of another RFU level

21   would have resulted in a different DNA profile being shown, or that DNA matching his profile

22   would not have been found in the mixed-source sample from the condom had different

23   methodology been used.  Such evidence would have gone to the weight, rather than the

24   admissibility of the DNA evidence.  *See generally Daubert*, 509 U.S. at 596 ("Vigorous cross-

25   examination, presentation of contrary evidence, and careful instruction on the burden of proof are

26   the traditional and appropriate means of attacking shaky but admissible evidence.") In sum, the

1    admission of DNA evidence did not render petitioner's trial fundamentally unfair.  *See Estelle*,

2    502 U.S. at 70 (holding that admission of evidence which is "relevant to an issue in the case"

3    does not violate due process).

4            Moreover, even if admission of the DNA evidence were found to be a

5    constitutional violation, the error would have been harmless.  On habeas corpus review, relief is

6    warranted for constitutional error only if the error had "substantial and injurious effect or

7    influence in determining the verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993).  Here,

8    the strength of the prosecution's case lay in the cumulative and consistent testimony of the

9    various victims, both as to what crimes occurred and who the perpetrators were.  The DNA and

10   other forensic evidence corroborated the victims' testimony but did not make or break the

11   prosecution's case, especially as to petitioner, who was convicted in connection with crimes

12   against Lori, C.W., Rebecca, and A.T.

13           DNA evidence was introduced in connection with the crimes against Lori,

14   Rebecca, and A.T., but none of that evidence implicated petitioner.  DNA evidence implicated

15   petitioner only in the case of C.W.  In particular, petitioner's DNA was found in a mixed source

16   sample from a condom left at the crime scene.  It is significant, however, that C.W. also picked

17   petitioner as one of her attackers from a photo lineup.  (Reporter's Transcript ("RT") at 4296-97,

18   4298, 4308-09.)  In addition, at trial, C.W. identified petitioner as the thin passenger who was the

19   second person to sexually assault her in the car.  (RT at 2078.)  Considering the minimal amount

20   of DNA evidence admitted against petitioner in light of C.W.'s eyewitness identification and the

21   strength of the prosecution's case at trial, the DNA evidence did not have a substantial and

22   injurious effect or influence in determining the jury's verdicts as to the counts against petitioner.

23   Thus even if constitutional error occurred, it was harmless.

24           B.      Ground Five (Blood Draw)

25           Petitioner claims that his Fourth Amendment right to be free from unreasonable

26   searches and seizures was violated when a sample of his blood was involuntarily drawn for DNA

18

1   typing and inclusion in the California Department of Justice's convicted offender data bank.

2           Petitioner raised this claim on direct appeal but the state appellate court found the

3   claim had been forfeited because neither petitioner nor any of his co-defendants filed a motion to

4   suppress or otherwise challenged the constitutionality of the blood draws in the trial court.

5   *People v. Deo*, *supra*, at 22 (citing *People v. Miranda*, 44 Cal.3d 57, 80 (1987) ("a motion to test

6   the validity of a search or seizure must be raised in the superior court to preserve the point for

7   review on appeal")).  No court order authorizing the blood draw appeared in the trial record nor

8   was there any indication whether the draw was voluntary or involuntary.  This failure to make

9   and preserve a factual record of the circumstances of the blood draw "doomed" the contention on

10  appeal.  *People v. Deo*, *supra*, at 22 (citing *People v. Akins*, 128 Cal.App.4th 1376, 1385 (2005)).

11          Respondent contends that petitioner's claim is procedurally barred in this court

12  based on his failure to file a contemporaneous objection at trial and the state court's subsequent

13  finding that he forfeited a challenge to the constitutionality of the blood draws on appeal.

14           As a general rule, a federal habeas court "will not review a question of federal

15  law decided by a state court if the decision of that court rests on a state law ground that is

16  independent of the federal question and adequate to support the judgment."  *Calderon v. United*

17  *States District Court (Bean)*, 96 F.3d 1126, 1129 (9th Cir. 1996) (quoting *Coleman v. Thompson*,

18  501 U.S. 722, 729 (1991)).  For a state procedural rule to be independent, the state law basis for

19  the decision must not be interwoven with federal law.  *LaCrosse v. Kernan*, 244 F.3d 702, 704

20  (9th Cir. 2001).  To be deemed adequate, it must be well established and consistently applied.

21  *Poland v. Stewart*, 169 F.3d 575, 577 (9th Cir. 1999).  An exception to the general rule exists if

22  the prisoner can demonstrate either cause for the default and actual prejudice as a result of the

23  alleged violation of federal law, or that failure to consider the claims will result in a fundamental

24  miscarriage of justice.  *Coleman*, 501 U.S. at 750.

25          Once the state has pleaded the existence of an independent and adequate state

26  procedural ground as an affirmative defense, as respondent has in this case, the burden shifts to

1   petitioner to place the adequacy of that procedural rule in issue.  *Bennett v. Mueller*, 322 F.3d

2   573, 586 (9th Cir. 2003).  Thereafter, the state retains the ultimate burden of proving adequacy of

3   the asserted bar.  *Id*. at 585-86.

4           Here, respondent met the initial burden by pleading that this prosecutorial

5   misconduct claim is procedurally defaulted for petitioner's failure to object at trial.  Thus, the

6   burden shifted to petitioner to place the adequacy of California's contemporaneous objection rule

7   into question as "the scope of the state's burden of proof thereafter will be measured by the

8   specific claims of inadequacy put forth by the petitioner."  *Bennett*, 322 F.3d at 584-85.

9   Petitioner has offered no argument that the contemporaneous objection rule invoked by the state

10  court was not an independent and adequate basis for its decision.  Nor has he demonstrated cause

11  for his default or that a miscarriage of justice would result if his claim is not heard.[2]

12  Accordingly, review of his prosecutorial misconduct claim is barred.  Petitioner has failed to

13  satisfy his interim burden under *Bennett* and it must be concluded that the state procedural bar

14  applied to his case rests on an independent and adequate state procedural ground.  *See generally*

15  *King v. Lamarque*, 464 F.3d 963, 967 (9th Cir. 2006) ("*Bennett* requires the petitioner to 'place

16  [the procedural default] defense in issue" to shift the burden back to the government").  It is

17  noted that the Ninth Circuit has held California's contemporaneous objection rule to be

18  independent and adequate on various occasions, affirming the denial of a federal petition on

19  grounds of procedural default where there was a failure to object to at trial.  *E.g.*, *Inthavong v.*

20  *Lamarque*, 420 F.3d 1055, 1058 (9th cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th

21  Cir. 2004) (jury instruction claim procedurally barred for failure to object); *Melendez v. Pliler*,

22  288 F.3d 1120, 1125 (9th Cir. 2002) (citing *Garrison v. McCarthy*, 653 F.2d 374, 377 (9th Cir.

23  1981); *Vansickel v. White*, 166 F.3d 953, 957 (9th Cir. 1999); *Bonin v. Calderon*, 59 F.3d 815,

24  842-43 (9th Cir. 1995).

25  ────────────

26          [2] Petitioner filed a traverse but made no allegations as to the adequacy of the state
    procedural bar or his default therein.

1  Even if this claim were not procedurally barred, its merits would not warrant

2  relief.  To the extent petitioner's claim attacks the use of his DNA for inclusion in the state's

3  DNA data bank *after* conviction, he fails to allege a cognizable federal habeas corpus claim

4  because the use of the evidence in that manner was not for the purpose of supporting his

5  conviction.  *See* Cal. Penal Code § 295(e) (West 2003).  To the extent he challenges introduction

6  of the DNA evidence at trial as unconstitutionally obtained in a search or seizure, the claim

7  likewise fails.  The United States Supreme Court has conclusively determined that "where the

8  State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a

9  state prisoner may not be granted federal habeas corpus relief on the ground that evidence

10  obtained in an unconstitutional search or seizure was introduced at his trial."  *Stone v. Powell*,

11  428 U.S. 465, 494 (1976); *see also Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996)

12  ("The relevant inquiry is whether petitioner had the opportunity to litigate his claim, not whether

13  he did in fact do so.").

14  C.  Ground Six (Admission of Photographs)

15  Petitioner claims that his rights to due process and a fair trial under the Sixth and

16  Fourteenth Amendments were violated when the trial court admitted several photographs seized

17  from his vehicle.  While some of the seized photographs were excluded as overly prejudicial,

18  including those depicting various co-defendants "throwing what appeared to be gang signs," nine

19  other photographs were admitted into evidence over petitioner's objections.  Depicted in the

20  admitted photographs were petitioner and some of his co-defendants, either singularly or

21  together, sometimes in possession of a black gun.  In one photograph, petitioner is pointing a gun

22  at his own head and in another he is holding the gun and a bottle of beer while smoking a

23  cigarette.  *People v. Deo*, *supra*, at 33.  Another shows co-defendant Narayan near a gun and yet

24  another shows an unidentified man pointing the gun at Naryan's head, with co-defendant Deo

25  nearby.  *Id*. The trial court ruled the photographs admissible under section 352 of the California

26  Code of Evidence to show prior association of the defendants and possession of a gun.

1    On direct review, the California Court of Appeal held that all the photographs

2 were properly admitted under state evidentiary law. *People v. Deo*, *supra*, at 34.  In particular,

3 the photographs were probative because the gun depicted was similar to the gun described by

4 some victims and, in any case, under California law evidence of weapons or ammunition other

5 than that used in the crime can be probative.  *Id*. (citing *People v. Neely*, 6 Cal.4th 877, 896

6 (1993) and *People v. Price*, 1 Cal.4th 324, 434 (1991)).  Moreover, the photographs were not

7 overly prejudicial:

8              The only ones that could be prejudicial are those showing
             defendants with guns; the others simply show young men, some
9              drinking beer.  As the trial court noted, the pictures with the gun
             would likely be construed as showing defendants "clowning
10             around."  In the context of the allegations against defendants,
             showing them playing with guns was not unduly prejudicial.

11

12 *People v. Deo*, *supra*, at 34.

13    To any extent petitioner contends that the photographs should have been excluded

14 pursuant to section 352 of the California Evidence Code or that they were otherwise inadmissible

15 under state evidentiary law, the claim fails because habeas corpus will not lie to correct errors in

16 the interpretation or application of state law.  *Estelle*, 502 U.S. at 67-68.

17    With respect to the due process claim asserted, the United States Supreme Court

18 has held that habeas corpus relief should be granted where constitutional errors have rendered the

19 trial fundamentally unfair.  *Williams*, 529 U.S. at 375.  No Supreme Court precedent has made

20 clear, however, that admission of irrelevant or overly prejudicial evidence can constitute a due

21 process violation warranting habeas corpus relief.  *See Holley*, 568 F.3d at 1101 ("The Supreme

22 Court has made very few rulings regarding the admission of evidence as a violation of due

23 process. Although the Court has been clear that a writ should be issued when constitutional errors

24 have rendered the trial fundamentally unfair [ ], it has not yet made a clear ruling that admission

25 of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to

26 warrant issuance of the writ." (citation omitted)).

1    Even assuming that the improper admission of evidence under some

2  circumstances rises to the level of a due process violation warranting relief under the AEDPA,

3  this is not such a case.  Petitioner's claim would fail even under Ninth Circuit precedent,

4  pursuant to which an evidentiary ruling renders a trial so fundamentally unfair as to violate due

5  process only if "there are *no* permissible inferences the jury may draw from the evidence."

6  Windham, 163 F.3d at 1103 (emphasis in original) (quoting *Jammal*, 926 F.2d at 920; *see also*

7  *Boyde,* 404 F.3d at 1172 ("A habeas petitioner bears a heavy burden in showing a due process

8  violation based on an evidentiary decision.").

9    From the challenged evidence in this case, the jury could have drawn permissible

10  inferences petitioner previously possessed a gun and that he associated with his codefendants

11  prior to the attacks on some of the victims.  Moreover, as the state court noted, in the context of

12  the allegations at trial, admission of photographs showing the defendants merely in the

13  possession of a gun, as opposed to threatening or terrorizing anyone, was not unduly prejudicial.

14  *People v. Deo*, *supra*, at 34.  Petitioner's trial was not rendered  fundamentally unfair in violation

15  of due process based on admission of the photographs.  *See Estelle*, 502 U.S. at 67-68.

16    D.    Ground Eight[3] (CALJIC No. 10.01)

17    Petitioner claims the jury instructions on aider and abettor liability improperly

18  directed the jury to make an "in concert" finding if it found that he was an aider and abettor of

19  the offenses committed by others.

20    The jury was instructed with CALJIC No. 10.01, in relevant part, as follows:

21    The phrase acting in concert means two or more persons acting
     together in a group crime and includes not only those who
22    personally engage in the act constituting the crime but also those
     who aid and abet a person in accomplishing it.  To establish that a
23    defendant voluntarily acted in concert with another person, it is not
     necessary to prove there was any prearrangement, planning, or
24    scheme.

25  _____

26    [3] As previously noted, petitioner's ground seven is not addressed because it merely
     duplicates the allegations of ground six.

1    *People v. Deo*, *supra*, at 37.

2          Petitioner claims that this instruction created a mandatory presumption in

3    violation of his right to due process.  Petitioner argues that the jury was improperly directed to

4    make an in concert finding if it found that petitioner was an aider and abettor of the sexual

5    offenses committed by others in this case.

6          The California Court of Appeal rejected the claim of error:

7          Defendants contend the trial court erred in instructing in the
          language of CALJIC No. 10.01 because that instruction told the
8          jury that an aider and abettor was also necessarily acting in concert.
          Singh argues that acting in concert "must require some coercive
9          participation proximate to the offense, not merely antecedent or
          incidental aiding or abetting." Singh further argues the instruction
10         improperly created an irrebuttable presumption or partially directed
          a verdict and violated due process. We reject these contentions.[4]

11

12         Penal Code section 264.1 provides increased punishment for one
          who "voluntarily acting in concert with another person, by force or
13         violence and against the will of the victim" commits any of certain
          sex offenses "either personally or by aiding and abetting the other
          person."

14

15         "The purpose behind the increased punishment provided for by the
          'in concert' statute is to discourage 'gang type' sexual assaults.
16         [Citation.] It also exhibits a legislative recognition that rape is even
          more reprehensible when committed by two or more persons.
17         [Citation.] As its language indicates, the statute punishes persons
          acting in concert (together) who either personally commit the act or
18         assist others in its commission. If both defendants 'acting together'
          each rape the victim, the 'in concert' clause has been satisfied, and
19         there is no need to inquire whether one aided or abetted the other.
          Acting 'in concert' is not necessarily synonymous with 'aiding and
20         abetting.'" (*People v. Jones* (1989) 212 Cal.App.3d 966, 969, 260
          Cal.Rptr. 853.)

21         Contrary to Singh's argument, acting in concert does not require
          participation or personal presence at the crime; aiding and abetting
22         is sufficient. (*People v. Lopez* (1981) 116 Cal.App.3d 882, 888,
          172 Cal.Rptr. 374.)

23

24   *People v. Deo*, *supra*, at 37.

25   _____

26         [4] Elsewhere in the opinion it is noted that petitioner joined in this claim made by co-
     defendant Singh.

                                         24

1    To obtain federal habeas corpus relief based on errors in jury instructions, a

2  petitioner must show that the "ailing instruction by itself so infected the entire trial that the

3  resulting conviction violates due process." *Estelle*, 502 U.S. at 72.  There must also be "a

4  reasonable likelihood that the jury has applied the challenged instruction in such a way that

5  violates the Constitution."  *Id.* (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

6    The Due Process Clause protects the accused against conviction except upon

7  proof beyond a reasonable doubt.  *In re Winship*, 397 U.S. 358, 364 (1970).  A jury instruction

8  creating a mandatory presumption, that is, one that requires jurors to find a presumed fact if the

9  state proves another fact, violates due process.  *Carella v. California*, 491 U.S. 263, 265-66

10 (1989).  Such an error is subject to harmless error review.  Relief is available on federal habeas

11 corpus for an unconstitutional jury instruction only if it had a substantial and injurious effect or

12 influence in determining the jury's verdict.  *See Hanna v. Riveland*, 87 F.3d 1034, 1039 (9th Cir.

13 1996) (applying *Brecht* harmless error review to instructional error on habeas corpus review).

14   Petitioner fails to demonstrate a due process violation or that the state court's

15 rejection of his claim was contrary to, or an unreasonable application of clearly established

16 Supreme Court precedent.  Petitioner cites no applicable federal authority in support of his

17 contention that CALJIC No. 10.01 creates a mandatory presumption directing an in concert

18 finding merely because the jury finds aiding and abetting.  In any event, the court of appeal

19 explained that, under state law, evidence demonstrating aiding and abetting is sufficient to show

20 acting in concert and no personal participation is necessary.  Such a finding binds this court on

21 federal habeas corpus.  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

22   Even if CALJIC No. 10.01 did contain a mandatory presumption that violated due

23 process, the error would have been harmless.  *See Hanna*, 87 F.3d at 1039.  Ample record

24 evidence allowed the jury to reasonably find that petitioner acted in concert with personal

25 participation in the rapes of Lori, C.W., Rebecca, and A.T.  Their testimony demonstrated that

26 petitioner was more than an aider and abettor; he was personally present and facilitated the

sexual assaults by his co-defendants.  He also personally participated in the attacks, raping each

of his four victims and forcibly orally copulating three of them.  Petitioner is not entitled to relief

for the trial court's instruction with CALJIC No. 10.01.

        E.      Ground Nine (Sentencing)

        Petitioner claims that his indeterminate prison sentence of twenty-five years to life

pursuant to section 667.61(d)(2) violated his due process and equal protection rights because the

same conduct is punishable by a lesser term under subdivision (e)(1) of the same statute.

        On direct review, the state court of appeal described and rejected petitioner's

claim as follows:

> Singh contends his due process and equal protection rights were violated by imposing a 25-year to life sentence on count 28, rape in concert, based on an aggravated kidnapping circumstance.[5] (Pen.Code, § 667.61, subd. (d)(2).) He contends that because the aggravated kidnapping circumstance requires nothing more than that required for kidnapping to commit rape, which triggers a 15-year to life sentence, he should receive the lesser sentence. Because the statute expressly provides the harsher sentence should apply, we reject his contention.
>
> Singh challenges portions of the one strike law, which "sets forth an alternative and harsher sentencing scheme for certain enumerated sex crimes perpetrated by force." (*People v. Manchebo* (2003) 27 Cal.4th 735, 741, 117 Cal.Rptr.2d 550, 41 P.3d 556.) It provides a sentence of 25 years to life for one convicted of certain forcible sex offenses "under one or more of the circumstances specific in subdivision (d) or under two or more of the circumstances specified in subdivision (e)." (Pen.Code, § 667.61, subd. (a).) Singh's contention focuses on two kidnapping circumstances, one under subdivision (d) and one under subdivision (e).
>
> Penal Code section 667.61, subdivision (d)(2) provides: "The defendant kidnapped the victim of the present offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense in subdivision (c)." This is the "aggravated kidnapping circumstance." (*People v. Jones* (1997) 58 Cal.App.4th 693, 704, fn. 5, 68 Cal.Rptr.2d 506.) It subjects a defendant to a

---

[5] Elsewhere in the petition it is noted that petitioner joined in this claim made by co-defendant Singh.

26

1    sentence of 25 years to life. (Pen.Code, § 667.61, subd. (a).)

2    In contrast, the "simple kidnapping circumstance" (*People v.*
3    *Jones, supra,* 58 Cal.App.4th at p. 705, fn. 6, 68 Cal.Rptr.2d 506),
     subjects a defendant to a sentence of 15 years to life (Pen.Code, §
     667.61, subd. (b)), unless there are two or more circumstances
4    under subdivision (e). (Pen.Code, § 667.61, subd. (a).) The simple
     kidnapping circumstance provides: "Except as provided in
5    paragraph (2) of subdivision (d), the defendant kidnapped the
     victim of the present offense in violation of Section 207, 209, or
6    209.5." (Pen.Code, § 667.61, subd. (e)(1).)

7    Penal Code section 209 is kidnapping for ransom or for robbery or
     a sex crime. The portion punishing kidnapping for robbery or a sex
8    crime with a life sentence applies only "if the movement of the
     victim is beyond that merely incidental to the commission of, and
9    increases the risk of harm to the victim over and above that
     necessarily present in, the intended underlying offense."
10   (Pen.Code, § 209, subd. (b)(2).) This "risk of harm" language is
     very similar to the aggravated kidnapping circumstance.
11
     Singh contends that in this case there is no distinction between the
12   simple kidnapping and aggravated kidnapping circumstances, both
     require an increased risk of harm, yet one imposes a more severe
13   punishment than the other. He argues such arbitrary application,
     dependent on the prosecutor's charging discretion, violates both
14   due process and equal protection.

15   Singh's argument fails because he overlooks the introductory
     language to the simple kidnapping circumstance. It begins, "Except
16   as provided in paragraph (2) of subdivision (d)...." By this
     language, the Legislature recognized that in some cases the two
17   kidnapping circumstances would be the same and chose the greater
     to apply. In this case, only the more severe punishment for the
18   aggravated kidnapping circumstance applies and there is no
     violation of due process or equal protection.
19
     Kumar and Deo join in this argument as to counts 24, 39, 52 and
20   61, on which they were sentenced to 25 years to life sentences.  We
     reject their claims for the reason set forth above.  In addition,
21   because the jury also found true the allegation of multiple victims
     (Pen. Code, § 667.61, subd. (e)(5)), they had two subdivision (e)
22   circumstances and would have received the 25-year to life sentence
     even without the aggravated kidnapping circumstance.
23

24   *People v. Deo, supra,* at 42-43 (footnote omitted).

25       "The Equal Protection Clause of the Fourteenth Amendment commands that no

26   State shall 'deny to any person within its jurisdiction the equal protection of the law,' which is

                                         27

essentially a direction that all persons similarly situated should be treated equally." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985).  Federal courts apply a strong presumption that governmental classifications do not violate equal protection unless they implicate a suspect class of persons or a fundamental interest.  *See City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).  In the context of a sentencing statute, the Ninth Circuit has held that to establish an equal protection violation, a habeas corpus petitioner must show that the statute is actually applied unevenly to criminal defendants in general or that it was unevenly applied to him.  *McQueary v. Blodgett*, 924 F.2d 829, 834-35 (9th Cir. 1991).  Sentencing schemes are evaluated under the rational basis test, which asks whether the challenged legislation bears a rational relationship to a permissible state objective.  *See Id*. at 835 n.7.  Since "the Constitution does not require identical treatment," a mere demonstration of inequality or unequal results is not enough to make a prima facie case; rather, "[t]here must be an allegation of invidiousness or illegitimacy in the statutory scheme before a cognizable claim arises."  *Id*. at 835.

In evaluating due process claims arising from charging decisions, the Supreme Court requires "exceptionally clear proof" before inferring an abuse of prosecutorial discretion. *McCleskey v. Kemp*, 481 U.S. 279, 297 (1987); *see also United States v. Armstrong*, 517 U.S. 456, 463 (1996) (when a defendant contends that the prosecutor made a charging decision in violation of the Constitution, the standard of proof "is a demanding one").

As the court of appeal explained, section 667.61(e)(1) of the California Penal Code (aggravated kidnapping) explicitly does not apply where there is also a finding of aggravated kidnapping pursuant to subdivision (d)(2) ("risk of harm" kidnapping).  Such a finding binds this court.  *Richey*, 546 U.S. at 76.  Moreover, the statutory scheme bears a rational relationship to a permissible state objective: punishing more harshly those kidnappings that involve movement of the victim and thus a corresponding greater risk of harm. This is not a case in which "exceptionally clear proof" demonstrates that the prosecutor abused his discretion in alleging a kidnapping circumstance under section 667.61(d)(2).  Accordingly, the court of

1   appeal's rejection of petitioner's equal protection and due process claims premised on the

2   application of section 667.61(d)(2) is not contrary to, or an unreasonable application of clearly

3   established Supreme Court precedent.

4          Moreover, an independent state law basis for rejection of the claim exists.  As the

5   Court of Appeal noted, the jury also found true a separate special circumstance that petitioner

6   committed his sex crimes against multiple victims.  *See* Cal. Penal Code § 667.61(e)(5).  Thus,

7   even if the prosecution had alleged the kidnapping circumstance under subdivision (e)(1) rather

8   than subdivision (d)(2), petitioner still would have been sentenced to terms of twenty-five years

9   to life because two separate circumstances would have been proven.  *See* Cal. Penal Code §

10  667.61(a).  The Court of Appeal's finding in this regard provides an independent basis for

11  upholding petitioner's sentences apart from any constitutional law determination.  *See generally*

12  *In re Snyder*, 472 U.S. 634, 642 (1985) ("We avoid constitutional issues when resolution of such

13  issues is not necessary for disposition of a case.").

14         F.     Ground Ten (CALJIC No. 6.11)

15         The prosecution presented three possible theories of liability: direct, aiding and

16  abetting, and conspiracy.  The jury was instructed with CALJIC No. 6.11 on conspiracy as

17  follows:

18              Each member of a criminal conspiracy is liable for each act and
                bound by each declaration of every other member of the conspiracy
19              if that act or declaration is in furtherance of the object of the
                conspiracy. [¶] The act of one conspirator pursuant to or in
20              furtherance of the common design of the conspiracy is the act of all
                conspirators. [¶] A member of a conspiracy is guilty of the
21              particular crime that to his knowledge his confederates agreed to
                and did commit. [¶] You must determine whether the Defendant is
22              guilty as a member of a conspiracy to commit the originally agreed
                upon crime or crimes, and, if so, whether the crime alleged in the
23              Information was perpetrated by a co-conspirator in furtherance of
                that conspiracy and it was an agreed-upon criminal objective of
24              that conspiracy, if using the conspiracy theory of liability.

25  *People v. Deo*, *supra*, at 35 n.21.

26  /////

1    Petitioner claims that conspiracy does not exist as an independent theory of

2  liability under California law, and that the trial court erred in instructing the jury that conspiracy

3  was one of three theories on which the defendants' guilt could be based.  In particular, petitioner

4  asserts that liability based on a conspiracy theory is precluded by section 31 of the California

5  Penal Code[6] and that this violation of state law violated his right to federal due process.  In

6  rejecting this claim on direct review, the California Court of Appeal found no error of state law

7  based on the trial court's instruction with conspiracy as one of the three theories of criminal

8  liability.  *People v. Deo*, *supra*, at 35 -36.

9    As previously noted, alleged errors in state law cannot form the basis for federal

10  habeas corpus relief.  *See Estelle*, 502 U.S. at 67-68.  The crux of petitioner's claim is that

11  California law, and in particular section 31 of the California Penal Code, does not provide

12  conspiracy as an independent basis of criminal liability.  This is a state law claim which the court

13  of appeal noted in its decision has been repeatedly rejected by the California Supreme Court.  *See*

14  *People v. Rodrigues*, 8 Cal.4th 1060, 1134 (1994) ("It is firmly established that evidence of

15  conspiracy may be admitted even if the defendant is not charged with the crime of conspiracy.");

16  *People v. Belmontes*, 45 Cal.3d 744, 788 (1988) ("It is long and firmly established that an

17  uncharged conspiracy may properly be used to prove criminal liability for acts of a

18  coconspirator.") (overruled on other grounds in *People v. Doolin*, 45 Cal.4th 390, 421 n.22

19  (2009)); *People v. Washington*, 71 Cal.2d 1170, 1174 (1969) ("Where there is evidence of a

20  conspiracy to commit the substantive offense charged, it is not error to instruct the jury on the

21  law of conspiracy even though no conspiracy is charged.").  Absent an obvious attempt to evade

22  the constitutional issue, this court is bound by the California Supreme Court's interpretation of

23  its own laws.  *See Richey*, 546 U.S. at 76; *Mullaney v. Wilbur*, 421 U.S. 684, 691 & n.11 (1975).

24

25    [6] The statute provides, in relevant part: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission... are principals in any crime so

26  committed."  Cal. Penal Code § 31.

1  It is further noted that a habeas corpus petitioner may not "transform a state-law issue into a

2  federal one merely by asserting a violation of due process." *Langford v. Day*, 110 F.3d 1380,

3  1389 (9th Cir. 1996).

4          In sum, petitioner fails to show that the California Court of Appeal's rejection of

5  his claim regarding CALJIC No. 6.11 was contrary to or an unreasonable application of any

6  clearly established Supreme Court precedent.

7          G.       Ground Eleven (Unanimity)

8          For his final ground, petitioner claims that all counts based on alternative theories

9  of liability must be reversed because there was no requirement of unanimity on the intent element

10 of any of those counts.  As to this claim, the court of appeal held:

11              The jury was fully instructed on the applicable law. The court
                instructed the jury that there were three possible theories of
12              liability and it need not agree on the theory of liability. The jury
                was instructed that under a theory of direct and active liability, only
13              general intent was required for rape, rape in concert, oral
                copulation, oral copulation in concert, sodomy and sodomy in
14              concert. Specific intent was required for these crimes under a
                theory of liability based on conspiracy or aiding and abetting.
15              Aiding and abetting required the intent of committing, encouraging
                or facilitating the commission of the crime. A conspiracy required
16              the specific intent to agree to commit the crime and the specific
                intent to commit that crime. The jury was also instructed it could
17              consider defendant's voluntary intoxication in deciding whether he
                possessed the required specific intent.
18
                "A unanimity instruction is required only if the jurors could
19              otherwise disagree which act a defendant committed and yet
                convict him of the crime charged." (*People v. Gonzales* (1983) 141
20              Cal.App.3d 786, 791, 190 Cal.Rptr. 554; accord *People v. Burns*
                (1987) 196 Cal.App.3d 1440, 1458, 242 Cal.Rptr. 573.) It is not
21              required that the jury agree on the theory of criminal liability.
                (*People v. Majors* (1998) 18 Cal.4th 385, 408, 75 Cal.Rptr.2d 684,
22              956 P.2d 1137.) The requirement of jury unanimity applies to acts
                that could have been charged as separate offenses; the jury need
23              not agree whether the accused was the actual perpetrator or an
                aider or abettor. (*People v. Beardslee* (1991) 53 Cal.3d 68, 92, 279
24              Cal.Rptr. 276, 806 P.2d 1311.)

25 *People v. Deo*, *supra*, at 36.

26 /////

1       Again, "the Due Process Clause protects the accused against conviction except

2 upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which

3 he is charged." *In re Winship*, 397 U.S. at 364.  Although California requires unanimity from all

4 twelve jurors in a criminal trial (*see* Cal. Const. Art. I, § 16), the Fourteenth Amendment requires

5 neither a twelve-person jury nor a unanimous jury in state criminal trials. *Williams v. Florida*,

6 399 U.S. 78, 86 (1970); *Apodaca v. Oregon*, 406 U.S. 404, 410-413 (1972).  Thus, in a general

7 sense, criminal defendants in state court have no federal constitutional right to a unanimous jury

8 verdict. *See Apodaca* , 406 U.S. at 410-12.

9       Moreover, clearly established Supreme Court precedent indicates that the

10 Constitution does not require unanimous agreement on the mental state of a defendant to find

11 him guilty of a particular offense. *See Schad v. Arizona*, 501 U.S. 624, 631-32 (1991).  In *Schad*,

12 the Supreme Court held that when a single crime can be committed by various means, the jury

13 need not unanimously agree on which means were used so long as they agree that the crime was

14 committed. *Id*. at 631-32; *see also Id*. at 649 (Scalia, J., concurring in judgment) ("it has long

15 been the general rule that when a single crime can be committed in various ways, jurors need not

16 agree upon the mode of commission").  The *Schad* court upheld the defendant's conviction for

17 first-degree murder where the prosecutor argued alternate theories of premeditated murder

18 (which requires intent to kill) and felony murder (which does not require intent to kill) and the

19 instructions did not require that the jurors unanimously agree on the theory of conviction. *Id*. at

20 629-32.  In rejecting the claim, the Supreme Court explained "[t]he issue in this case... is one of

21 permissible limits in defining criminal conduct, as reflected in the instructions to jurors applying

22 the definitions, not one of jury unanimity." *Id*. at 631.  The Supreme court added:

> If a state's courts have determined that certain statutory alternatives
> are mere means of committing a single offense, rather than
> independent elements of the crime, we simply are not at liberty to
> ignore that determination and conclude that the alternatives are, in
> fact, independent elements under state law.

26 *Id*. at 638.

1    The court of appeal's rejection of petitioner's claim is therefore not contrary to or

2    an unreasonable application of *Winship*, *Schad*, or any other clearly established Supreme Court

3    precedent.  Petitioner is not entitled to relief.

4                                        VI.  CONCLUSION

5    For all the foregoing reasons, IT IS HEREBY RECOMMENDED that the

6    application for writ of habeas corpus be DENIED.

7    These findings and recommendations are submitted to the United States District

8    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-

9    one days after being served with these findings and recommendations, any party may file written

10   objections with the court and serve a copy on all parties.  Such a document should be captioned

11   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

12   shall be served and filed within seven days after service of the objections.  Failure to file

13   objections within the specified time may waive the right to appeal the District Court's order.

14   *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

15   1991).

16   DATED: June 7, 2011

17                                        *Charlene H. Sorrentino*

18                                        CHARLENE H. SORRENTINO
                                          UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26